# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 24-0640

JAMES MARTIN WITKOWSKI, APPELLANT,

V.

DOUGLAS A. COLLINS,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 29, 2025[1]                                          Decided 10/21/2025)

*April Donahower*, of Providence, Rhode Island, for the appellant.

*Emily P. Stanley*, with whom *Richard J. Hipolit*, Principal Deputy General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Mark J. Hamel*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before ALLEN, *Chief Judge*, and PIETSCH, BARTLEY, GREENBERG, MEREDITH, TOTH, FALVEY, LAURER, and JAQUITH, *Judges*. FALVEY, *Judge*, filed the opinion of the Court. JAQUITH, *Judge*, filed a concurring opinion. MEREDITH, *Judge*, filed an opinion concurring in the result and dissenting in part, which BARTLEY, *Judge*, joined.

FALVEY, *Judge*: Our decision in *Bowling v. Principi*, 15 Vet.App. 1, 10 (2001), forbids the Board of Veterans' Appeals from awarding a total disability rating based on individual unemployability (TDIU) on an extraschedular basis without first receiving a decision from the Director of Compensation Service (Director). This appeal requires us to reconsider *Bowling* and its effects on VA's appellate procedure. Because the rule from *Bowling* defies intervening Supreme Court caselaw by interpreting a regulation to compress the Board's jurisdiction, we hold that it is overruled and therefore remand this case for further adjudication.

## I. THE BOUND BOARD

Before describing *Bowling*'s moribund existence, we rehearse the facts of the controversy that delivered us here. Navy veteran James Martin Witkowski served our nation honorably during

---

[1] The case was argued before the panel of Judges Meredith, Falvey, and Jaquith before the case was called to the en banc Court.

the Vietnam War. Record (R.) at 1189, 1285. As a result of his service, he experiences bilateral hearing loss. R. at 1221, 1288. This appeal concerns Mr. Witkowski's journey to secure the highest possible rating, including the 100% rating provided by a TDIU grant.

TDIU is awarded when a veteran cannot secure or follow substantially gainful employment because of service-connected disabilities that meet certain ratings. *Bowling*, 15 Vet.App. at 6; 38 C.F.R. § 4.16(a) (2025). Should the veteran fail to meet those rating requirements, TDIU may still be granted by VA on an extraschedular basis under 38 C.F.R. § 4.16(b). *Phillips v. McDonough*, 37 Vet.App. 394, 399 (2024). Under that regulation, "rating boards should submit to the Director . . . for extra-schedular consideration all cases of veterans who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards set forth in paragraph (a) of this section." 38 C.F.R. § 4.16(b). Our decision in *Bowling* forces the Board to refer matters to the Director for a first opinion when extraschedular TDIU may be a viable option. *Bowling*, 15 Vet.App. at 10 (interpreting § 4.16(b)). This requirement became a problem for Mr. Witkowski.

After Mr. Witkowski asked for a higher rating in February 2019, the Board eventually awarded him schedular TDIU effective August 30, 2021. R. at 1194; 182. Although the Board determined that his disability "likely precludes him from engaging in gainful employment," it also found that Mr. Witkowski's "hearing loss, alone, would not preclude [him] from engaging in gainful employment" before that effective date. R. at 192.

Mr. Witkowski filed a supplemental claim that included a vocational opinion that said that the veteran could not find or retain gainful employment from "at least February 2019 and continuing to the present." R. at 114-15. The regional office denied an earlier effective date for TDIU, setting up the pins for Mr. Witkowski's current appeal. R. at 66.

Before the Board again, Mr. Witkowski waived his right to further development and a review by the Director. R. at 34. In that waiver, he asserted that "the prohibition on awarding TDIU . . . in the first instance has long been implicitly overruled by case law" and statute. R. at 34. Mr. Witkowski thus requested that the Board grant him entitlement to extraschedular TDIU in the first instance rather than remand his case for referral or additional development. R. at 35. That waiver and request drove Mr. Witkowski into a collision with *Bowling*.

This brings us to the December 26, 2023, decision we review today. In that decision, the Board granted TDIU from June 17, 2021, because Mr. Witkowski's hearing loss met the schedular

2

rating criteria from that date on.[2] R. at 16-18. But it determined that only a grant of extraschedular TDIU would satisfy Mr. Witkowski before then because he did not meet the requisite rating criteria for that earlier period. R. at 18-19. The Board also found, predictably, that it could not grant those benefits; it was "bound by the case law requiring initial consideration by the Director . . . of entitlement to extra-schedular TDIU." R. at 19. With Mr. Witkowski's waivers accepted, his claim for benefits had to perish.

## II. *BOWLING* AND ITS DISCONTENTS

Mr. Witkowski now renews his argument against the requirement that the Board must refer extraschedular TDIU to the Director for an initial review. He clarifies that, although the Board cited *Snider v. McDonough*, 35 Vet.App. 1 (2021), to support its finding, it really relied on our decision in *Bowling*, which was "the first case to articulate that requirement." Appellant's Brief (Br.) at 6 n. 2. We agree that Mr. Witkowski's headache is with *Bowling*; our opinion in *Snider* did not examine the referral requirement and instead took it for granted. *See Snider*, 35 Vet.App. at 10. But before we outline Mr. Witkowski's objections to *Bowling* and its adherent cases, it is prudent to revisit that decision to see what condition its condition is in.

In *Bowling*, the claimant was service connected for post-traumatic stress disorder but was beyond the reach of schedular TDIU; his disabilities did not satisfy the rating requirements in § 4.16(a). 15 Vet.App. at 8. We found that the Board's factual underpinnings for its denial of TDIU rested on faulty foundations and that the decision therefore lacked an adequate statement of reasons or bases. *Id*. at 9. Although we reversed the Board's determination that the claimant was ineligible for extraschedular benefits, we found that we could not order the Board to award extraschedular TDIU at that time. *Id*. at 10. Rather, we interpreted § 4.16(b) to demand that the matter be referred to the Director "because the Board has no power [to award extraschedular TDIU] in the first instance." *Id*. Our regulatory interpretation thereby gave rise to the *Bowling* rule—the requirement that, rather than decide the appropriate rating on appeal, the Board had to remand extraschedular TDIU to the Director.

---

[2] Our jurisdiction does not permit us to review this favorable finding. *See Medrano v. Nicholson*, 21 Vet.App. 165, 170 (2007), *aff'd in part, dismissed in part sub nom. Medrano v. Shinseki*, 332 F. App'x 625 (Fed. Cir. 2008). The Board also denied various other claims for an increased rating for hearing loss and a rating over 50% for major depressive disorder with anxious distress. R. at 5. But because Mr. Witkowski only challenges the Board's denial of extraschedular TDIU, we will not discuss these other denials. *See Pederson v. McDonald*, 27 Vet.App. 276, 283 (2015) (en banc). Thus, we will dismiss these unchallenged matters.

3

This ruling, in effect, formed a tripartite process by which the Board is required to handle extraschedular TDIU assertions. If the Board finds even a "reasonable possibility" that extraschedular TDIU exists within a case, it must first follow the imperative in *Bowling* and refer that matter to the Director. *See Snider*, 35 Vet.App. at 10. Next, the Director would determine whether benefits are *actually* warranted; there may be cases where there is smoke but no fire. Finally, resulting regional office denials that incorporate the Director's decision may be appealed to the Board, which would then examine that decision with a de novo standard of review. Instead of a straightforward process in which the veteran appeals a denial of a higher rating and the Board decides that appeal, the *Bowling* rule created this labyrinthian waltz.

But even as we continued to credit *Bowling*'s interpretation of § 4.16(b) over the years, members of this Court expressed misgivings. *See Wages v. McDonald*, 27 Vet.App. 233, 236 (2015) ("Although this regulation refers to 'rating boards' and does not specifically mention the Board, this Court has held that § 4.16(b) applies to the Board.") (citing *Bowling*, 15 Vet.App. at 1). One Judge condemned *Bowling* as being "wrongly decided." *Id*. at 239-40 (Kasold, C.J., concurring). And more recently, three Judges urged the full Court to "reconsider our precedent barring the Board from considering extraschedular matters in the first instance." *Snider v. McDonough*, No. 19-6707, 2022 WL 1604574, at *1 (Vet. App. May 20, 2022) (Toth, J., dissenting from the denial of en banc review).

VA benefits practitioners also express skepticism of *Bowling*, routinely telling us that its interpretation of § 4.16(b) forces a world of procedural pain onto all involved. To start, some say that the three-step process is cumbersome, requiring the Board to police the protean perimeter of plausibility without deciding the case. *See* Secretary's Motion for En Banc Review, *Snider*, No. 19-6707, at *9 (Dec. 10, 2021). Although this standard provides guidance to the Board, there should be little dispute that it is more unstable than simply allowing the Board to review the merits would be. And we note that this benchmark, while designed to safeguard both the roles of the Board and the Director under *Bowling*, is not articulated or implied anywhere in Title 38 or its supporting regulations.

We likewise understand that litigants, including the parties, blame the *Bowling* referral requirement for a "process that delays ultimate Board review to the detriment of veterans." Secretary's Br. at 15; *see* Appellant's Br. at 10-11. The resulting delay, they say, creates a procedural speedbump for extraschedular cases: the construction of a redundant "de facto decision

4

of the agency of original jurisdiction" by the Director. *Wages*, 27 Vet.App. at 239. Moving a claim past this step could inconvenience veterans. Under the Veterans Appeals Improvement and Modernization Act (AMA), a claimant cannot proceed to a Board review of a post-referral denial of benefits without first filing a new Notice of Disagreement. 38 C.F.R. § 20.800(e) (2025). This readjudicatory rule forces the claimant to the end of the Board's lengthy caravan and leads to the regrettable reality that review of extraschedular TDIU by the Board could take well over a year from the Director's decision.

Both Mr. Witkowski and the Secretary join the anti-*Bowling* consensus and ask the Court to strike the rule after years of unnecessary referrals. Appellant's Br. at 5; Secretary's Br. at 15. Two arguments are offered in support of this cause: the first would hold that the *Bowling* rule is irreconcilable with the Supreme Court's rulings prohibiting regulatory limitations on jurisdiction. The second would hold that *Bowling* incorrectly interpreted § 4.16(b). But despite the widespread agreement that it should be held ineffective, we hesitate to throw *Bowling* into the gutter.

Even if both parties rightly disclaim a ruling—adherence to our established precedent "restrains judicial hubris and reminds us to respect the judgment of those who have grappled with important questions in the past." *Dobbs v. Whole Women's Health Org.*, 597 U.S. 215, 264 (2022). Thus, we do not lightly proceed to the parties' arguments against *Bowling*. When possible, it is better to resolve complicated cases narrowly and avoid upsetting settled practices. *See* NEIL GORSUCH, A REPUBLIC, IF YOU CAN KEEP IT 217 (2019) (describing the benefits of preserving past caselaw). But as we explain below, there is no other way to resolve this case.

### III. JURISDICTIONAL DEPRIVATION

The first argument Mr. Witkowski makes against *Bowling* is that the case is "'irreconcilable with competing legal doctrines or principles'" articulated by the Supreme Court. Appellant's Br. at 6 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989)). He says that "*Bowling* wrongly gave jurisdictional significance to the regulatory referral requirement." *Id*. at 7. After we decided *Snider*, the Secretary similarly said that *Bowling* is "difficult to reconcile with today's understanding of the Board's broad jurisdiction." Secretary's Motion for Full Court Review at 9, *Snider*, 35 Vet.App. at 1 (No. 19-6707). Even so, the Secretary says that this issue may be overcome. Oral Argument (OA) at 23:00-24:00, https://www.youtube.com/watch?v=ILazRJ8yJfc.

5

After contrasting *Bowling's* rule against the Supreme Court's caselaw about jurisdictional rules, we agree with Mr. Witkowski's argument.

His contention is not novel. In a concurring opinion in *Wages*, Chief Judge Kasold said that *Bowling* did not engage with § 4.16(b)'s "interplay with the statutory scheme for adjudicating claims." 27 Vet.App. at 239. And three members of the Court argued that reconsidering *Bowling* would be wise because the decision might have "narrowed the jurisdiction Congress intended the Board to exercise." *Snider*, No. 19-6707, 2022 WL 1604574 at *2 (Toth, J., dissenting from the denial of en banc review). We also note that a parallel requirement for the referral of other extraschedular ratings draws similar criticism. *See Floyd v. Brown*, 9 Vet.App. 88, 99-100 (1996) (Steinberg, J., concurring and dissenting) (arguing that a denial of authority to the Board should not be implicit).

As an intermediate appellate court, we "must take our cue from the Supreme Court." *United States v. Lindsey*, 634 F.3d 541, 550 (9th Cir. 2011). To respect this basic tenet of vertical stare decisis, this Court adopted a prior precedent rule through which we may hold that our precedents have been effectively overruled by intervening and clearly irreconcilable Supreme Court caselaw. *Rorie v. McDonough*, 37 Vet.App. 430, 443-44 (2024). In other words, if new Supreme Court doctrine comes to light, and that doctrine conflicts with our caselaw, we may determine that our precedent is no longer controlling and is thus effectively overruled.

And when, as here, we are sitting as a full Court, we may also overrule our precedent, even if it is not clearly irreconcilable with a higher court's precedent. *See Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992) (holding that panel decisions may be overturned by an en banc Court). In such cases, we must consider whether stare decisis advises against overruling a panel decision; not so if the Supreme Court introduced binding directives on the matter that we are required to follow.

To satisfy the grueling "clearly irreconcilable" standard, intervening Supreme Court caselaw must directly contradict our decision, either by its holding or its "mode of analysis." *Troy v. Samson Manufacturing Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (quoting *Miller v. Gammie*, 335 F3d 889, 893 (9th Cir. 2003) (en banc)). Thus, as we conduct our own analysis, we will look not only at the Supreme Court's relevant disposition, but at the theories and reasoning used to arrive at a decision.[3] *See Rorie*, 37 Vet.App. at 443.

---

[3] When a Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected

The Supreme Court decisions at issue in this case are those discussing "the important distinctions between jurisdictional prescriptions and claim-processing rules." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010). While jurisdictional rules deal with the "'power to hear a case,'" *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)), claim-processing rules do not aim to expand or reduce "the adjudicatory domain of a tribunal," *Union Pacific R.R. Co. v. Brotherhood of Locomotive Eng'rs & Trainmen Gen. Comm.*, 558 U.S. 67, 81 (2009). Instead, claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). While claim-processing rules may be waived or otherwise forfeited, jurisdictional rules are mandatory. *See McIntosh v. United States*, 601 U.S. 330, 337 (2024); *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004).

These cases also make plain that only Congress—not this Court or an agency—can create jurisdictional rules. *See Riley v. Bondi*, 145 S. Ct. 2190, 2201 (2025). Once the legislature decides to convey or recall jurisdiction over a tribunal, regulations from the executive branch cannot expand or retract that authority. *Union Pacific*, 558 U.S. at 71. Thus, VA's regulations may never be considered jurisdictional without flouting the Supreme Court's caselaw. *See Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 19 (2017); *Hall v. McDonough*, 34 Vet.App. 329, 333 (2021).

The Board's jurisdictional statute provides that matters under 38 U.S.C. § 511(a) are subject to one appeal, with final decisions on "[a]ll questions in a matter" being made by the Board. 38 U.S.C. § 7104(a). Under section 511(a), the Secretary is required to "decide all questions of law and fact necessary to a decision under . . . a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans." When claims are appealed to the Board from a regional office, the Board has "the authority to address *all issues* related to that claim, even those not previously decided" by that office. *Jarrell v. Nicholson*, 20 Vet.App. 326, 332 (2006) (en banc) (emphasis added). Thus, Congress decided that, once the Secretary made an initial decision on a rating, the Board would have jurisdiction to review that decision.

---

in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484 (1989).

With this in mind, we consider whether *Bowling*'s rule is jurisdictional in nature.[4] Although the Supreme Court offered the guidance we observed above, there is no escaping the reality that this "distinction between jurisdictional conditions and claim-processing rules can be confusing in practice." *Reed Elsevier*, 559 U.S. at 161; *cf. Gonzalez v. Thaler*, 565 U.S. 134, 169-70 (2012) (Scalia, J., dissenting) (arguing that some claims-processing rules are jurisdictional). We must chart the murky waters of "jurisdiction," a word of "'many, too many, meanings,'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)), to see where our past interpretation stands. But despite the general lack of clarity surrounding jurisdiction, we are confident that *Bowling*'s referral rule is a jurisdictional— not a claim-processing—requirement.

We begin by repeating the familiar refrain that jurisdiction is a "court's power to decide a case or issue a decree." *Jurisdiction*, BLACK'S LAW DICTIONARY (12th ed. 2024). A cascade of cases agree with this definition.[5] *See, e.g.*, *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *McDonald v. Mabee*, 243 U.S. 90, 91 (1917); *United States v. Cotton*, 535 U.S. 625, 630 (2002); *Arbaugh*, 546 U.S. at 514. And as a practical matter, a century's worth of law bolsters this meaning by which to identify jurisdictional limitations. *Cf. Bowles v. Russell*, 551 U.S. 205, 209 n.2 (2007); *Reed Elsevier*, 559 U.S. at 168. Indeed, that definition was increasingly the deciding factor at the Supreme Court. *See* Erin Morrow Hawley, *The Supreme Court's Quiet Revolution: Redefining the Meaning of Jurisdiction*, 56 WM. & MARY L. REV. 2027, 2082-89 (2015).

In this view, the Court in *Bowling* essentially construed § 4.16(b) as a jurisdictional limitation. Just look at the language we used: "[T]he Board has *no power* [to award extraschedular TDIU] in the first instance." *Bowling*, 15 Vet.App. at 10 (emphasis added). Even though the decision never used the word "jurisdiction" in the operative sentence, *Bowling* held that the Board lacked the ability and authority to adjudicate extraschedular TDIU in the first instance. We need not utter shibboleths to speak in jurisdictional terms; a plain reference to the heartland of the

---

[4] Of course, § 4.16(b)—devoid of *Bowling*'s referral requirement—must itself be a claim-processing rule because it is a VA regulation. *See Hall*, 34 Vet.App. at 333. This analysis is limited to whether our discussion in *Bowling* treats § 4.16(b) as such. But, as we will explain, we would find that intervening Supreme Court precedent effectively overruled *Bowling* even if it considered § 4.16(b) to be a claim-processing rule.

[5] Some draw a distinction between the "power" to hear a case and the "authority" to do so. *See* Evan Tsen Lee, *The Dubious Concept of Jurisdiction*, 54 HASTINGS L.J. 1613, 1637 (2003). For the purposes of this case, we think the terms go hand-in-hand, as the Supreme Court has thought before. *See Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838) ("If the law confers the power to render a judgment or decree, then the court has jurisdiction . . . .").

doctrine is enough to invoke its consequences. *Cf. Henderson*, 562 U.S. at 436. Our reference to the limits of the Board's power gave *Bowling* a jurisdictional connotation.

Naturally, our use of "power" in relation to the Board's ability does not automatically make the rule jurisdictional either. We should not, after all, interpret caselaw the same way we interpret statutes. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). And the inadequacy of isolated buzzwords aside, it is also prudent to examine the context surrounding a prohibitive proclamation. In discerning the practical effect of *Bowling*, we look to the general premise that jurisdiction helps to identify "forum in a multiforum system" by defining "both where a dispute belongs and where it does not." Scott Dodson, *Jurisdiction and its Effects*, 105 GEO. L.J. 619, 634 (2017).

That is precisely what *Bowling*'s rule does. According to that case, § 4.16(b) acts as an instrument of partition, cleaving away a section of issues from the Board and giving them exclusively to the Director. *Bowling* looked to VA's multiforum system of decisionmakers and found that the regulation prevented a type of dispute—first-instance extraschedular TDIU—from being adjudicated by a certain decisionmaker. In other words, *Bowling* sought to police the perimeter of the Board's authority as it related to that of other powers within VA. Thus, in context and by its own terms, *Bowling* did not engage with § 4.16(b) as it would with a mere claim-processing rule. To the contrary, it required that the regulation be given jurisdictional effect against the Board without exception.

It is impossible to adhere to *Bowling* without constricting the Board's jurisdiction that Congress envisioned in section 7104(a).[6] Questions about extraschedular TDIU are inseparable from the authority and power afforded the Secretary and the Board—they concern a "question[] of law and fact necessary to a decision" involving veterans benefits. 38 U.S.C. § 511. Indeed, TDIU is an issue that is raised, decided, and appealed as part of a claim for an increased rating. *See Rice v. Shinseki*, 22 Vet.App. 447, 453-54 (2009). If such extraschedular TDIU queries are raised to the Board through a regional office decision—or raised by the record or the parties—the Board must be able to hear and decide that issue, just as it would be able to in any other case. It may, after all,

---

[6] During oral argument, the Secretary told us that there is not a *complete* jurisdictional bar because the Board may decide whether to refer the TDIU claim to the Director. OA at 23:00-24:00. But nowhere in the Supreme Court cases we cite does the Court take such an approach to jurisdiction. His argument is also undercut by the language of sections 7104 and 511(a), which gives the Secretary the authority to decide "*all* questions of law and fact" related to veterans benefits and the Board to make final decisions on "[a]ll questions in a matter." (Emphasis added). And the real problem is not that the Board can decide to refer a matter, but that the Board cannot decide the merits of extraschedular TDIU.

9

award a total rating even if the regional office considered a lower rating; TDIU is just another path by which the Board can assign such a rating. *See Phillips*, 37 Vet.App. at 400.

That *Bowling* prevents the Board from granting extraschedular TDIU benefits in the first instance is not only wildly inconsistent with the structure and limits of these other ratings, but it places a regulatory cage around the disputes that the Board may decide under sections 7104(a) and 511(a). And such limitations from regulations are prohibited by the Supreme Court's understanding of jurisdiction, as articulated after our decision in *Bowling*. *See Hamer*, 583 U.S. at 19; *Union Pacific*, 558 U.S. at 71. Considering this precedent and theory, we understand our past perception of § 4.16(b) to be erroneous; VA does not possess the ability to prescribe or rescind Board jurisdiction. That power abides with Congress alone.

True, *Bowling* did not offer a detailed explanation of § 4.16(b) and its relationship to the Board's jurisdiction. It instead relied on *Floyd*, which interpreted a similar regulation to bar the Board from considering certain extraschedular ratings in the first instance. *Bowling*, 15 Vet.App. at 10 (citing *Floyd*, 9 Vet.App. at 94). For its part, the analysis in *Floyd* also failed to explicitly mention whether its holding was jurisdictional. *See* 9 Vet.App. at 94-96.

But like *Bowling*, *Floyd* used a jurisdictional term of art—the Court's "authority" to determine a given matter—to justify and inform its interpretation. *Id*. And *Floyd* and *Bowling* involved the same basic jurisdictional question: In which tribunal does an unconsidered extraschedular rating assertion belong? This is all to say that the *Bowling* court's reliance on *Floyd* for interpretive guidance does not call our discussion into doubt. Both cases involved a similar issue that was elucidated in a manner evocative of jurisdictional rules. Of course, determining whether *Floyd* also contradicts Supreme Court precedent is beyond the scope of the present inquiry.

This analysis delivers a decisive blow to *Bowling*. As we discussed above, § 4.16(b) cannot be interpreted to prevent the Board from deciding extraschedular TDIU cases in the first instance without kidnapping the Board's jurisdiction. But because that is what *Bowling* did, its reasoning is inapposite to the Supreme Court's intervening caselaw that disallows anyone but Congress from shaping the Board's jurisdiction. Our decision in *Bowling* has therefore been effectively overruled insofar as it requires the Board to refer assertions of entitlement to extraschedular TDIU to the Director rather than to hear those arguments itself—as its jurisdiction would otherwise permit. *See*

10

*Rorie*, 37 Vet.App. at 443-44. And, for good measure, we take this opportunity to explicitly overrule this offending passage in *Bowling*. *See Bethea*, 2 Vet.App. at 254.

Even if we were to read *Bowling* to view § 4.16(b) as a claim-processing rule, its referral requirement must be found inoperable based on the same caselaw. The Supreme Court has made clear that litigants should have the opportunity to waive or forfeit a claim-processing rule. *Kontrick*, 540 U.S. at 456. The *Bowling* referral requirement, however, is a mandatory part of extraschedular TDIU reviews. *See Wages*, 27 Vet.App. at 236. And because parties cannot waive or forfeit § 4.16(b) without violating this directive, the Supreme Court's description of claim-processing rules also effectively overruled *Bowling* notwithstanding the regulation's court-given jurisdictional veneer. *See Rorie*, 37 Vet.App. at 443-44. Thus, our decision to explicitly overrule *Bowling*'s directive to refer extraschedular TDIU cases to the Director in the first instance is compelled by Supreme Court caselaw, no matter how that directive is framed.

## IV. REGULATORY REINTERPRETATION

Mr. Witkowski also asserts that, aside from curtailing the Board's jurisdiction with an improper rule, *Bowling* engaged in a "cursory and incorrect regulatory analysis" that independently warrants its demise. Appellant's Br. at 10. The Secretary likewise says that *Bowling*'s view of § 4.16(b) is "inconsistent with the plain language" of that regulation. Secretary's Br. at 15.

With *Bowling*'s veneer pushed away by the weight of Supreme Court authority, we think it important to engage with these arguments even if the offending legal rule is now gone. If *Bowling* read the regulation correctly, then it is the text of § 4.16(b), not just our *Bowling* opinion, that limits the Board's jurisdiction and the regulation is thereby invalid.[7] We think it wrong to leave the legality of the regulation in such a nihilistic ethos. In the end, we conclude that § 4.16(b) still has force because its subject did not include the Board. Thus, *Bowling*'s interpretation of § 4.16(b) was over the line. And its reading cannot be ransomed by an appeal to the doctrine of stare decisis.

Recall that *Bowling* found that § 4.16(b) required an extraschedular TDIU assertion on appeal to "be submitted to the [Director] because the Board has no power to do so in the first instance." 15 Vet.App. at 10. We based that interpretation on our earlier decision in *Floyd*, which

---

[7] Engaging with this contention also ensures regulatory stability should jurisdictional limitations shift.

11

interpreted a similar regulation: 38 C.F.R. § 3.321(b).[8] *Bowling*, 15 Vet.App. at 10 (citing *Floyd*, 9 Vet.App. at 94-97).

In that case, we held that the Board could not decide extraschedular ratings (outside of TDIU) in the first instance. *Floyd*, 9 Vet.App. at 94. We first explained that the Secretary may delegate decision-making power to others within the VA system, including the Director. *Id*. at 95. Building on that principle, the Court then decided that the "proper procedure" was to preclude review until the Director could exert the "authority" afforded by § 3.321(b). *Id*. at 95-96.

Because the mere "authority" written into § 3.321(b) was a tamer word choice than § 4.16(b)'s stronger instruction that extraschedular TDIU cases "should" be submitted to the Director when applicable, we held in *Bowling* that the same preclusion must apply to the Board under the latter regulation.[9] We later elucidated *Bowling*'s interpretation, explaining that the requirement that "rating boards" must refer qualifying matters to the Director indeed includes the Board of Veterans' Appeals. *Wages*, 27 Vet.App. at 236 ("Although this regulation refers to 'rating boards' and does not specifically mention the Board, this Court has held that § 4.16(b) applies to the Board"); *see also Ray v. Wilkie,* 31 Vet.App. 58, 64 n.3 (2019*)* (citing *Bowling* as "holding that § 4.16(b) applies to the Board.").

Even a cursory look at § 4.16(b)'s language and VA's topography reflects that *Bowling*'s interpretation was incorrect. The beauty of our second reading of the regulation is its simplicity; we start—and end—with the regulation's requirement that "*rating boards* should submit to [the Director] all cases" dealing with extraschedular TDIU. 38 C.F.R. § 4.16(b) (emphasis added). That directive states that *only rating boards* are bound by the regulation. Our quandary therefore becomes whether the Board counts as a rating board under § 4.16(b). In *Bowling*, we answered in the affirmative. *Bowling*, 15 Vet.App. at 10.

That answer, however, ignored a critical distinction in VA's history and structure. In the earlier years of VA's adjudication system, initial decisions were made at the regional offices by a panel of three experts called a "rating board," whose decisions could then be appealed to the Board

---

[8] At the time of that decision, § 3.321(b) provided, in relevant part, that "to the exceptional case where the schedular evaluations are found to be inadequate, the Under Secretary for Benefits or the Director, Compensation and Pension Service, upon field station submission, is authorized to approve on the basis of the criteria set forth in this paragraph an extra-schedular evaluation."

[9] This case and interpretation do not call our discussion of jurisdictional rules into question. No matter VA's delegations of power or related praxes, only Congress can settle the Board's jurisdiction.

of Veterans' Appeals—a separate, central tribunal. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 309-11 (1985) (explaining the VA process before the Veterans Restorative Justice Act). Although the rating boards dissipated after various rulings of this Court, it was clear from the start that the Board's mission and position was separate from the various rating boards. *See* Charles L. Cragin, *The Impact of Judicial Review on the Department of Veterans Affairs' Claims Adjudication Process*, 46 ME. L. REV. 23, 24-26 (1994). Rating boards existed at the local level within regional offices, while the Board was a national appellate tribunal.

The difference between the Board and rating boards is also apparent and recognized in caselaw from this Court and the Federal Circuit. *See Wages*, 27 Vet.App. at 236; *Cook v. Principi*, 318 F.3d 1334, 1437 n.14 (Fed. Cir. 2002); *Peyton v. Derwinski*, 1 Vet.App. 282, 283 (1991). And it has also been recognized in the halls of Congress. *See* H.R. 3269, 103d Cong., 1st Sess. § 4(a) (1993) (proposing legislation that would eliminate rating boards).

To be sure, § 4.16(b) has been amended since we interpreted *Bowling* and the new version shows no dissatisfaction with that decision; the language remained the same. *Compare* § 4.16(b) (2001) *with* 38 C.F.R. § 4.16(b) (2025). But that event matters little; the distinction between rating boards and the Board remains the same and indicates that the Secretary did not intend the Board to refer extraschedular TDIU in each case. Moreover, divining VA's endorsement of *Bowling* from its isolated regulatory edits would require overwhelming evidence of acquiescence. *See AMG Cap. Mgmt. v. F.T.C.*, 593 U.S. 67, 81 (2021); *Rapanos v. United States*, 547 U.S. 715, 750 (2006). Not only are there no such signs here, but the Secretary actively disputes our past reading. We are better off searching for meaning from the regulation's content rather than its longevity.

"Word choices have consequences," and the word choice in this regulation "virtually leaps off the page. There is no principled way that we can treat it as meaningless." *S.E.C. v. Tambone*, 597 F.3d 436, 443 (1st Cir. 2010). VA's widespread use of the words "the Board" (rather than "rating board") in the Code of Federal Regulations reflects that VA understood how to reference the Board and could alter § 4.16(b) to explicitly include that tribunal if it wanted to, especially after sustained attempts by litigants to revisit *Bowling*'s holding. But VA failed to do so, signaling that it meant for the regulation to apply to one entity and not the other.

When we examine the words "rating board" in the context of VA adjudication, *Bowling*'s reading was incorrect. *See United States v. Hansen*, 599 U.S. 762, 775 (2023) (requiring courts to apply a specialized meaning of a word as context dictates). Only rating boards should submit

extraschedular TDIU cases to the Director, so the Board must be exempt from this requirement because it is not a rating board. Thus, *Bowling* is twice wrong: not only did it violate the Supreme Court's later practice regarding jurisdictional rules, but it engaged in a fatally flawed exercise of regulatory interpretation. And for that reason, we find that § 4.16(b) remains valid but does not apply to the Board.

## V. WHY DISTURB THE CALM?

Although it was unnecessary to consider whether the doctrine of stare decisis should save precedent that is contravened by higher authority, *see Rorie*, 37 Vet.App. at 444, it is necessary when we disturb a precedent's interpretation of a regulation.[10] *See Ravin v. Wilkie*, 31 Vet.App. 104, 111-15 (2019) (en banc); Richard W. Murphy, *Separation of Powers and the Horizontal Force of Precedent*, 78 NOTRE DAME L. REV. 1075, 1077 n.10 (2003) (describing vertical versus horizontal stare decisis). The application of stare decisis is not an exact science, but the Supreme Court has identified several factors that aid us in our decision. Those factors include the nature of any error in the previous decision, the effects of the previous decision, and the reliance interests placed on the previous decision. *Ramos v. Louisiana*, 590 U.S. 83, 121-23 (2020) (Kavanaugh, J., concurring in part); *Janus v. Am. Federation of State, County & Mun. Emps., Council 31*, 585 U.S. 878, 917 (2018). Here, we find nothing to belay our decision to overturn *Bowling*. In fact, we are reassured that our decision is necessary.

First, we consider whether *Bowling* was "not just wrong, but grievously or egregiously wrong." *Ramos*, 590 U.S. at 121. We think that it was. Putting aside that *Bowling* is inconsistent with later legal developments, *see Franchise Tax Board of Cal. v. Hyatt*, 587 U.S. 230, 248-49 (2019), the quality of its brief regulatory analysis is wanting. *See Janus*, 585 U.S. at 917-18. Alarm bells sound when *Bowling*'s comparison of § 4.16(b)'s text with that of § 3.321(b) failed to address or otherwise account for a distinct lexical difference; while § 4.16(b) limited its directive to rating boards, § 3.321(b) excluded any mention of rating boards. *See Martinez-Bodon v. McDonough*, 28 F.4th 1241, 1246 (Fed. Cir. 2022) (giving effect to each word in a regulation).

---

[10] We answer two questions: whether (1) *Bowling*'s referral requirement is irreconcilable with Supreme Court precedent; and (2) *Bowling* correctly interpreted § 4.16(b) to apply to the Board. The first question does not require a stare decisis analysis because our disposition is mandated by a higher court. But neither the Supreme Court nor the Federal Circuit has discussed the second question. To interpret the regulation differently than *Bowling*, therefore, would be to horizontally alter a panel decision of the Court and implicate stare decisis concerns.

14

By failing to engage with this dissimilar language, *Bowling* equated "rating boards" to the Board of Veterans' Appeals, an interpretation that is undoubtedly incorrect. This is because "rating boards" pointed to an adjudicatory body considered separate from the Board in VA history and cryptolect. Indeed, both the Secretary and Mr. Witkowski agree that *Bowling*'s interpretive analysis was lacking for these reasons, and when "neither party defends the reasoning of a precedent, the principle of adhering to that precedent . . . is diminished." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 363 (2010).

Second, we consider whether *Bowling* is the cause of practical or workability problems. *See Janus*, 585 U.S. at 921-26. This is not a difficult inquiry; it has caused both. Starting with real-world consequences, our decision in *Bowling* created a problem emblematic of delay, especially in AMA claims, where assertions of extraschedular TDIU referred to the Director by the Board would be forced to twice work their way up through VA's long line of cases. *See* 38 C.F.R. § 20.800(e). With *Bowling* overruled, such delay would not always be necessary.

Moving on to the workability of *Bowling*'s referral requirement, the availability of immediate review of extraschedular TDIU issues would likely improve the Board's caseload and uniformity by limiting the number of times the Board would be required to apply a malleable standard as part of a duplicative requirement. *See Wages*, 27 Vet.App. at 239. Put differently, *Bowling* limits the Board's ability to resolve straightforward cases involving extraschedular TDIU by requiring such matters to be referred to the Director. It is both unable to grant benefits when the correct evidence is present and unable to deny them when the law or facts cannot support a grant. With *Bowling* gone, however, the workability of extraschedular TDIU cases improves because the Board would no longer be forced into delaying the inevitable.

Third and finally, we look to the reliance interests placed on *Bowling*. Unsurprisingly, we cannot find any compelling interests. To begin, we note that "[c]onsiderations of stare decisis are at their acme in cases involving property and contract rights" but lessen when they concern "procedural and evidentiary rules." *Payne v. Tennessee*, 501 U.S. 808, 828 (1991). A regulatory requirement within the VA appeals system seems to qualify as a rule less deserving of reliance; veterans are not more likely to lose their property interest in VA benefits because the Board could hear extraschedular TDIU cases in the first instance. Further, unlike cases in which a party relies on a precedent to act in conformity to the law, *Bowling* effectively prevents a party from seeking

15

relief from the Board without a preliminary visit to the Director. *Cf. Citizens United*, 558 U.S. at 365. Thus, veterans likely have little interest in conforming to *Bowling*'s requirements.

The Secretary also has little at stake. Even without *Bowling*, the Board may be able to remand extraschedular TDIU cases to the Director in certain circumstances.[11] And because he has been telling the Court to overrule *Bowling* for years, this development should be unlikely to come as a surprise. *See Dobbs*, 597 U.S. at 287 ("Traditional reliance interests arise 'where advance planning of great precision is most obviously a necessity.'") (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992) (joint opinion)).Thus, neither party's reliance interests in *Bowling* give us pause as we overrule that decision.

Moreover, neither our jurisdictional analysis nor our regulatory reinterpretation nullifies the Director's role in evaluating extraschedular TDIU cases. This decision merely removes *Bowling*'s referral requirement. Thus, the Board may sometimes be able to remand a matter to the Director under § 20.802; when such a remand is possible or required is beyond the scope of this decision, as are the application of any mechanics and standards involved when VA conducts such a remand. The Director may also continue to act on the regional office level. But again, the Director's involvement is no longer a prerequisite when a case is appealed to the Board.

As part of this factor, we will also consider the extent to which any reliance on adjacent precedents will be harmed as a result of *Bowling*'s demise. *See Dobbs*, 597 U.S. at 289-90. After all, cases like *Wages*, *Ray*, and *Snider* depended in part on *Bowling*'s interpretation of § 4.16(b) and its applicability to the Board. *See Wages*, 27 Vet.App. at 236; *Ray*, 31 Vet.App. at 63-64; *Snider*, 35 Vet.App. at 8. To the extent that these cases repeat *Bowling*'s view that § 4.16(b)'s mention of "rating boards" includes the Board, we hold that such language is not controlling. Similarly, insofar as they repeat or rely on *Bowling*'s referral requirement, such language is also not controlling.

Given *Bowling*'s egregious legal error, its blight on the workability of TDIU appeals, and the lack of reliance placed upon it by the parties and the legal system, stare decisis is not a barrier to our conclusion that *Bowling* must be overruled. *See Ramos*, 590 U.S. at 121-23. As Judge

---

[11] Because the Board has jurisdiction to review first-instance extraschedular TDIU matters, the Board would no longer refer the matter to the Director but may instead remand it for further development in some cases. *See Young v. Shinseki*, 25 Vet.App. 201, 203 (2012). We leave for another day the question of when errors permit such a remand for further development by the Director and will hereinafter use the term "remand" rather than "refer" to describe the action the Board takes to send an extraschedular TDIU matter to the Director via the AMA in a post-*Bowling* world.

Steinberg implied is his partial dissent in *Floyd*, and as our discussions above highlight, the VA appeals system allows the Board to adjudicate extraschedular TDIU in the first instance. *See Floyd*, 9 Vet.App. at 99-100 (Steinberg, J., concurring). Without *Bowling*, it is now free to do so.

## VI. THE NECESSITY OF OUR HOLDING

To tie our analysis together, we now turn to the other arguments Mr. Witkowski made to the Court. Because their resolution depends on our view of *Bowling*, we found it necessary to first address the problems festering in that decision. The continued vitality of *Bowling* would have meant there was no error in the Board's decision in this case, or that any such error was harmless. And sometimes, *Bowling* would have stood in the way of any meaningful relief.

Mr. Witkowski first invited us to find that the Board should have waived § 4.16(b) and its referral requirement. Appellant's Br. at 14-21. This route, however, was inevitably blocked by *Bowling*. Although certain regulatory rules may be waived by the parties, *Bolds v. McDonough*, 37 Vet.App. 359, 365-66 (2024), the jurisdictional and mandatory decrees of this Court may not, *see McIntosh*, 601 U.S. at 337; *Tobler v. Derwinski*, 2 Vet.App. 8, 14 (1991) ("The refusal to consider the applicability of a controlling precedent of this Court constitutes an error as a matter of law."). Our holdings are not optional; there are rules.

For the Board to have waived the regulation and decided Mr. Witkowski's extraschedular TDIU assertion would have been tantamount to disregarding our ruling that the Board has "no power" to adjudicate such arguments without a preliminary decision by the Director. *See Bowling*, 15 Vet.App. at 10. Put differently, the Board does not follow our caselaw if it adjudicates the merits of an extraschedular TDIU assertion after permitting a claimant to waive Director referral. This is especially true given the jurisdictional valence of *Bowling*'s interpretation of § 4.16(b); the parties cannot waive such limitations. *See McIntosh*, 601 U.S. at 337.

And *Bowling* and its progeny did not need to directly discuss whether § 4.16(b) could be waived; no case should have to specify that its holding should be followed. Generally, waiver cannot be used to evade our understanding of the VA claims system and imbue the Board with power that it does not normally possess. Indeed, if the referral requirement could be discarded by a simple waiver of § 4.16(b), an unceasing stream of such waivers could effectively nullify *Bowling* without a formal decision by the Court. *Cf. Gun Owners of Am. v. Garland*, 19 F.4th 890, 899 n. 5 (6th Cir. 2021) (citing *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,

920 F.3d 1, 22 (D.C. Cir. 2019) (holding that one cannot waive an applicable precedent unless it represents a right or privilege)). Here, our decision in *Bowling* did not convey § 4.16(b) referral as a right or privilege to a veteran but set forth a mandatory procedure for VA to follow. With our precedent cementing it as such a procedure, we find that there was a "specific prohibition" against waiving § 4.16(b) as it was interpreted by the Court in *Bowling*. *See Bolds*, 37 Vet.App. at 365.

Mr. Witkowski also invites us to rule that the Board erred by insufficiently discussing the vocational opinion. Appellant's Br. at 19-20. But we cannot truly conclude that the Board erred insofar as it did not consider whether the opinion could result in an award of extraschedular TDIU in the first instance. First, the Board *did* consider the private opinion when determining whether Mr. Witkowski met the prescribed ratings for schedular TDIU. R. at 18. It did not need to discuss or weigh the opinion further; the Board understood that *Bowling* prevented it from reviewing an extraschedular TDIU award in the first instance and that Mr. Witkowski did not want his case to be remanded for further development. Put differently, the Board was required to deny the extraschedular TDIU rating no matter what it thought of the vocational opinion; even the best opinion supporting an award of TDIU would not have restored to the Board the power stripped by *Bowling* to decide extraschedular TDIU without a referral.

Besides how it treated the opinion, Mr. Witkowski also disagrees with the Board's finding that there was a "clear" duty to assist error. We agree with him that this finding is wrong. VA's duty to assist does not include considering evidence or referring matters to the Director. *See* 38 U.S.C. § 5103A (listing the requirements connected to the duty to assist). Although the Board has the discretion to remand for the correction of other errors, we express no opinion on whether VA's failure to refer the case to the Director as required by § 4.16 is such an error. *See* 38 C.F.R. § 20.802(a) (2025). Such a remand, however, is not based on VA's duty to assist. And there is no reason to think that the Board's error about the duty would have made a difference when it was still prohibited from awarding extraschedular TDIU in the first instance.

In the end, all lanes led to *Bowling*. Its interpretation of § 4.16(b) stood as an obstruction to Mr. Witkowski's award of TDIU and help from his other arguments. The parties could not waive the requirement for Director referral. Similarly, the Board could not analyze the vocational opinion in the extraschedular TDIU context because *Bowling* prevented it from adjudicating that issue in the first instance. But now, that impediment has been removed and the case can continue without a referral to the Director.

18

## VI. CONCLUSION

Our decision to overrule *Bowling* thus requires a remand so that the Board can decide Mr. Witkowski's appeal, unburdened by limits on its power to decide extraschedular TDIU. Any lesser relief would defy the longstanding principle that our decisions operate retrospectively and would thereby deal a blow to the reasonable expectations of claimants in this Court. *See Harper v. Va. Dep't of Tax.*, 509 U.S. 86, 97 (1993).

\* \* \*

For that reason, and the reasons explained above, the December 26, 2023, Board decision denying TDIU before June 17, 2021, on an extraschedular basis is VACATED and the matter is REMANDED for further adjudication consistent with this opinion. The balance of the appeal is DISMISSED.

JAQUITH, *Judge*, concurring: I join the excellent opinion written by Judge Falvey in its entirety. I write separately only to note that I agree with Judge Meredith's assertion that "fair process requires considering whether appellants would be prejudiced by the Board addressing an issue in the first instance, *see Bernard [v. Brown]*, 4 Vet.App. [384,] 394 [(1993)]." *Post* at 28 n.22.

MEREDITH, *Judge*, with whom BARTLEY, *Judge*, joins, concurring in the result and dissenting in part: We agree that remand is warranted because *Bowling v. Principi*, 15 Vet.App. 1, 10 (2001)—to the extent that it held that a regulation[12] categorically precludes the Board of Veterans' Appeals (Board) from awarding extraschedular TDIU in the first instance—has been effectively overruled by subsequent Supreme Court caselaw. But reluctantly, we cannot support the majority's analysis in that regard because it skims past the precedent and reasoning underlying *Bowling*'s holding. We also cannot join the majority's reinterpretation of 38 C.F.R. § 4.16(b) and

---

[12] The regulation at issue—38 C.F.R. § 4.16(b)—addresses the assignment of a total disability rating based on individual unemployability (TDIU) when a veteran does not meet the schedular disability rating thresholds in § 4.16(a), providing that "rating boards should submit to the Director, Compensation Service, for extra[]schedular consideration all cases of veterans who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards set forth in paragraph (a)." 38 C.F.R. § 4.16(b) (2025). Although this regulation and others at issue in this appeal refer to the Chief Benefits Director; the Under Secretary for Benefits; the Director, Compensation and Pension Service; and the Director of Compensation Service, for purposes of ease, we refer to those officials collectively as the Director.

assessment of whether the stare decisis factors weigh in favor of discarding *Bowling* altogether because those portions of the opinion are unnecessary to the disposition of this appeal and because we have different views as to the appropriate analysis.

## I. OVERVIEW

In the decision on appeal, the Board found that it could not adjudicate extraschedular TDIU in the first instance and, because the appellant had asked that the matter not be remanded for the Director to consider that issue, the Board denied such a rating. The Board's reasoning stems from this Court's decision in *Bowling*, which determined that § 4.16(b) prohibits the Board from awarding extraschedular TDIU without initially referring the matter to the Director. Since then, the Supreme Court has made clear that regulatory claim-processing rules, even if phrased in mandatory terms, generally may be waived or forfeited by litigants. Because *Bowling* leaves no room for waiver or forfeiture of the referral requirement, we would find that it is clearly irreconcilable with that intervening precedent, and we would thus remand for the Board to readjudicate the matter absent the constraints of *Bowling*—that is, with the understanding that there is not an absolute prohibition against initial Board adjudication of extraschedular TDIU. Our colleagues, on the other hand, primarily conclude that *Bowling* contravenes Supreme Court caselaw because, in their view, our Court clearly attributed jurisdictional significance to the regulatory referral requirement. The limited reasoning in *Bowling* and the precedent on which it is premised, however, contain no such clear jurisdictional holdings. But regardless of the grounds on which the Court determines that *Bowling* has been undermined by Supreme Court caselaw, there is no need for the Court to then address the validity of § 4.16(b) and whether the stare decisis factors weigh in favor of formally overturning the Court's initial reading of the regulation—doing so provides no more relief than simply acknowledging that the mandatory nature of the referral requirement cannot stand and amounts to an impermissible advisory opinion.

## II. BACKGROUND

### A. Procedural History

As relevant to the issues on appeal, the appellant is service connected for bilateral hearing loss, rated 50%, effective February 26, 2019, and for major depressive order, rated 50%, effective August 30, 2021, and he has been assigned a schedular TDIU rating for the period beginning June

2021, when he first met the threshold rating requirements in § 4.16(a). *See* Record (R.) at 18, 64. This matter stems from the appellant's pursuit since 2019 of higher ratings, including through the grant of extraschedular TDIU. As support, he submitted a private vocational report, which reflects that he has been unemployable due solely to hearing loss since at least February 2019. R. at 108. After the RO denied TDIU for that period without considering the report or referring the matter of extraschedular TDIU to the Director, R. at 69-70, the appellant appealed to the Board, "expressly waive[d]" review by the Director under § 4.16(b), and asked that the Board issue a decision on the evidence of record. R. at 34 (emphasis omitted); *see* R. at 30, 31-40. The Board acknowledged this express waiver in the December 2023 decision on appeal but concluded that it could not address the matter under the circumstances because it was "bound by the case[]law requiring initial consideration [of extraschedular TDIU] by the Director." R. at 19. Thus, the Board "honor[ed] the [appellant's] request to not remand" and denied entitlement to extraschedular TDIU prior to June 2021. R. at 20.

## B. Parties' Contentions

On appeal to this Court, the appellant presents in his brief two avenues under which the Court may discard *Bowling*. Appellant's Brief (Br.) at 5-13. First, he asserts that the Court afforded jurisdictional significance to § 4.16(b) by prohibiting the Board from initially adjudicating extraschedular TDIU. *Id.* at 7-8. Because only Congress may expand or withdraw the Board's jurisdiction, he argues that *Bowling* is "'irreconcilable with competing legal doctrines or policies'" articulated in intervening Supreme Court caselaw. *Id.* at 6 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 173 (1989)). Under the "clearly irreconcilable" standard, he posits that a three-judge panel may contravene *Bowling* without an en banc decision. *Id.* at 8 (citing *Rorie v. McDonough*, 37 Vet.App. 430, 443-44 (2024)). Alternatively, the appellant contends that the Court's interpretation of § 4.16(b)—specifically, that the Board is a rating board within the meaning of the regulation—has been incorrect from the outset. *Id.* at 8-13. Thus, if a panel is not persuaded that the "clearly irreconcilable" standard has been met, he urges the Court to abrogate the traditional practice of stare decisis and convene en banc to overturn *Bowling*. *Id.* at 13 (citing *Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992)). Either way, he asks the Court to vacate the Board's decision and remand for readjudication absent initial Director referral. *Id.* The Secretary generally agrees that recent Supreme Court caselaw has called into question *Bowling*'s holding as

21

it relates to the Board's power to adjudicate extraschedular TDIU, Secretary's Br. at 10, and he asks the en banc Court to overrule that opinion, *id.* at 15.

Notably, at oral argument, the appellant acknowledged that, even if not jurisdictional, *Bowling*'s holding is still clearly irreconcilable with Supreme Court precedent because it acts as a categorical bar that leaves no room for waiver or forfeiture of Director referral. *See* Oral Argument at 5:50-6:20, *Witkowski v. Collins*, U.S. Vet. App. No. 24-0640 (oral argument held Apr. 29, 2025), https://www.youtube.com/watch?v=ILazRJ8yJfc. For his part, the Secretary noted the lack of a clear jurisdictional indication in *Bowling*, and he averred that Director referral under that opinion is not a complete jurisdictional limitation on the Board. *Id.* at 23:30-23:58, 38:10-38:30.

## III. DISCUSSION

### A. *Bowling* is Clearly Irreconcilable on Nonjurisdictional Grounds

In the years since *Bowling*, the Supreme Court has made clear "the important distinctions between jurisdictional prescriptions and claim-processing rules." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010). Unlike jurisdictional rules, claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011), and do not affect "the adjudicatory domain of a tribunal," *Union Pacific R.R. Co. v. Brotherhood of Locomotive Eng'rs & Trainmen Gen. Comm.*, 558 U.S. 67, 81 (2009). Of particular relevance here, claim-processing rules are generally only binding when properly asserted and are therefore subject to waiver or forfeiture. *Hall v. McDonough*, 34 Vet.App. 329, 332 (2021) (citing *Eberhart v. United States*, 546 U.S. 12, 19 (2005)). In *Bowling*, however, the Court ruled that "the Board has no power" to award extraschedular TDIU in the first instance. 15 Vet.App. at 10. Because this reading of § 4.16(b) as a categorical prohibition does not allow for waiver or forfeiture of Director referral, the "clearly irreconcilable" standard has been met—*Bowling* cannot be applied in a manner consistent with Supreme Court precedent and, therefore, it is no longer controlling. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003); *Rorie*, 37 Vet.App. at 443. And given that decisions of this Court generally apply retroactively, *Threatt v. McDonald*, 28 Vet.App. 56, 63 (2016) (per curiam order), remand is necessary for the Board to readjudicate the matter with the

22

understanding that there is not an absolute prohibition against the Board initially adjudicating extraschedular TDIU.

Where we depart from the majority is that this case does not require us to "chart the murky waters of 'jurisdiction'" to reach that conclusion, *ante* at 8 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)), because *Bowling* did not attribute jurisdictional significance to § 4.16(b). In holding that the Board had "no power" to adjudicate extraschedular TDIU in the first instance, the Court provided little substantive analysis, merely declaring as follows:

> [W]e do not accept the appellant's position that the Court may reverse the Board's decision not to award a § 4.16(b) TDIU rating and order the [Board] to assign such rating on remand. Such a reversal would . . . require us either to overrule or distinguish as inapplicable to § 4.16(b) the Court's prior precedent in *Floyd v. Brown*, 9 Vet.App. 88, 94-97 (1996), which held that the [Board] is not authorized to assign an extraschedular rating in the first instance under 38 C.F.R. § 3.321(b) (1995). . . . The regulation at issue in *Floyd* . . . merely "authorized" [the Director to approve extraschedular ratings], whereas § 4.16(b) provides that "rating boards should submit to the [Director] for extra[]schedul[a]r consideration all cases of veterans who are unemployable by reason of service-connected disabilities[."] The regulatory provision interpreted in *Floyd* is less directory than the one contained in § 4.16(b).
>
> In view of the precedent and reasoning in *Floyd*, . . . we hold today that we cannot order the Board to award TDIU under § 4.16(b), which, unlike § 3.321(b), provides that the claim should be submitted to the . . . Director, because the Board has no power to do so in the first instance.

15 Vet.App. at 10 (quoting 38 C.F.R. § 3.321(b) (1995); and then quoting 38 C.F.R. § 4.16(b) (2000)). Because the "clearly irreconcilable" standard requires the Court to determine whether higher-court precedent has "'undercut the *theory or reasoning underlying* the prior [court decision],'" *Rorie*, 37 Vet.App. at 443 (emphasis added) (quoting *Miller*, 335 F.3d at 900), such analysis must entail a thorough review of *Floyd*—which contains the only reasoning alluded to in *Bowling*.[13]

In *Floyd*, the Court grappled with the parallel issue of extraschedular ratings under 38 C.F.R. §3.321(b),[14] considering whether the Board erred in sua sponte assigning the veteran an

---

[13] Although the majority acknowledges *Floyd*, their opinion does not critically examine its reasoning before concluding that *Bowling* and *Floyd* made jurisdictional pronouncements.

[14] At the time, § 3.321(b)(1) provided that, "[t]o accord justice . . . to the exceptional case where the schedular evaluations are found to be inadequate, the [Director] . . . is authorized to approve . . . an extra[]schedular evaluation."

additional rating on an extraschedular basis where the matter had not first been considered by the Director. 9 Vet.App. at 94. The Court noted that § 3.321(b)(1) did not "specifically address whether the Board [was] itself precluded from assigning an extra[]schedular rating in the first instance . . . without prior referral . . . to the [Director]," but the Court ultimately held "that the Board is precluded" from doing so. *Id.* (emphasis omitted). The Court reasoned that the Secretary's authority to "'decide all questions of law and fact necessary to a decision . . . under a law that affects the provision of benefits,'" *id.* (quoting 38 U.S.C. § 511(a)), "may . . . be delegated pursuant to 38 U.S.C. § 512(a)," *id.*, and that the Secretary had delegated to the Director the authority "to approve extra[]schedular evaluations," *id.* at 95. Based on that delegation of authority, the Court concluded that "*the proper procedure* for extra[]schedular consideration . . . requires consideration in the first instance by the [Director]." *Id.* (emphasis added). Although the Court mentioned the statute defining the Board's jurisdiction, it did so to emphasize that the Board must comply with "'applicable provisions of law and regulation,'" which in that case included "regulations provid[ing] only for assignment in the first instance" by the Director. *Id.* (quoting 38 U.S.C. § 7104(a) (emphasis omitted)).

The *Floyd* Court further reasoned that, unlike traditional rating increases, extraschedular ratings are "subject to the procedural requirements" in § 3.321(b)(1)—specifically, referral to the Director. *Id.* Although that regulation "acts as a funnel to channel requests . . . through certain officials who possess the delegated authority to *assign*" extraschedular ratings, the Court explained, it "does not preclude the Board from *considering* whether referral . . . is required," and therefore, "the correct course of action for the Board . . . is to raise the issue and remand it *for the proper procedural actions* outlined in 38 C.F.R. § 3.321(b)(1)." *Id.* (third emphasis added). This is consistent, the Court continued, with the Board's regulatory obligation to remand cases for "'correction of a procedural defect.'" *Id.* (quoting 38 C.F.R. § 19.9 (1994) (emphasis omitted)).

Next, the Court emphasized that this "procedural requirement[]" does "not derogate from the [Board's] ability . . . to seek out all issues which are reasonably raised," but instead reflects that the Board "is obligated to follow the rules and regulations duly promulgated by the Secretary." *Id.* at 95-96. Importantly, however, the Court clarified that, for purposes of section 7104(a), the assignment of an extraschedular rating is not a separate "matter" from the increased rating claim; rather, it "is always part of the same claim even though *certain procedural requirements* must be met in the adjudication process." *Id.* at 96 (emphasis added). In other words, the Court determined

24

that the Board did have jurisdiction because extraschedular consideration is a question in the appeal of the matter of a claim for benefits, *see Bernard v. Brown*, 4 Vet.App. 384, 391 (1993), but contrary to the view of the dissenting judge, the majority in *Floyd* did not equate the extra procedural step of referral as an impingement on the Board's jurisdiction, *compare Floyd*, 9 Vet.App. at 96, *with id.* at 102-03 (Steinberg, J., concurring in part and dissenting in part).[15]

In sum, the *Floyd* Court did not couch its holding in jurisdictional terms, and there is nothing to suggest that it *intended* for its ruling to serve as a limit on the Board's ultimate adjudicatory domain.[16] Rather, *Floyd* stands for the proposition that, where the Secretary has delegated to certain individuals the authority to assign extraschedular ratings in the first instance, the Board must comply with that process, as it is bound to follow VA's regulations. Although we now know from Supreme Court caselaw that regulations containing those types of claim-processing rules must be subject to exception, *Floyd's* use of absolute terms to describe the Board's obligations does not transform its ruling into a jurisdictional holding when considering the entirety of its analysis. And because the *Bowling* Court simply relied on *Floyd* to provide a parallel structure for extraschedular ratings under § 4.16(b), there is nothing showing that the Court attributed jurisdictional significance to that regulation. All of this means that delving into jurisdictional questions is not necessary to find that *Bowling* runs afoul of later pronouncements from the Supreme Court. This Court simply treated a claim-processing rule as allowing for no exceptions, which may no longer stand.

### B. Regulatory Reinterpretation and Stare Decisis

Regardless of whether the Court takes a jurisdictional or nonjurisdictional path to find that *Bowling* has been effectively overruled, the result is the same: There is no longer a categorical prohibition on the Board addressing extraschedular TDIU in the first instance.[17] Although the

---

[15] To be sure, the Court in *Bowling* and *Floyd* held respectively that the Board lacks "power" and "authority" to address extraschedular ratings in the first instance, but those words alone do not necessarily convey a jurisdictional command. *See, e.g.*, 38 U.S.C. § 7252(a) (providing that the Court has "jurisdiction" to review Board decisions and has "power" to affirm, modify, or reverse those decisions); *O'Branovic v. Nicholson*, 19 Vet.App. 81, 83 (2005) (per curiam order) ("[T]he authority granted to this Court in 38 U.S.C. § 7261(a)(2) is a grant of power to the Court, and not a grant of jurisdiction.").

[16] Indeed, despite its holding, the Court in *Floyd*, referring to the Court's obligation to take due account of the rule of prejudicial error, "affirm[ed] the Board's grant of an extra[]schedular rating," 9 Vet.App. at 96, again suggesting that the Court did not intend for its decision to serve as a jurisdictional limitation on the Board.

[17] Even though the Board may now address extraschedular TDIU in the first instance, it is our view that the Board is not *precluded* from seeking initial consideration by the Director in appropriate cases.

appellant argues in the alternative that the en banc Court should overrule *Bowling* as having incorrectly applied the § 4.16(b) referral provision to the Board, it is simply unnecessary for the Court to do so.[18] To the extent that the majority suggests that its discussion in this regard will resolve whether § 4.16(b) is itself an invalid constraint on the Board's jurisdiction, neither party has argued that it is. And more importantly, as the majority explains in concluding that *Bowling* has been effectively overruled, "VA's regulations *may never be considered* jurisdictional," and claim-processing rules must be subject to exception. *Ante* at 7 (emphasis added). Indeed, the majority faults *Bowling* for interpreting § 4.16(b) as having jurisdictional implications and definitively holds that the regulation "cannot be interpreted to prevent the Board from deciding extraschedular TDIU" without inappropriately compressing the Board's jurisdiction. *Ante* at 10. As a result, there is no room for the Court to potentially interpret the same regulation as "limit[ing] the Board's jurisdiction," *ante* at 11, and therefore, there is nothing further for the Court to decide.[19] The regulation cannot be jurisdictional—it is subject to exception, and it does not constrain the Board's ability to decide extraschedular TDIU in the first instance.

Even though we thus would not interpret § 4.16(b) anew or consider whether the Court should formally overturn *Bowling*, *see ante* at 11-17, we offer a few observations. First, as to whether the Court in 2001 erred in applying § 4.16(b) to the Board, the majority relies on its own assessment that *Bowling* "equated 'rating boards' to the Board of Veterans' Appeals," *ante* at 15 (quoting 38 C.F.R. § 4.16(b)), and that its "flawed . . . regulatory interpretation" in that regard is egregiously wrong, *ante* at 14; *see ante* at 13-14.[20] True, *Bowling* required the Board to comply

---

[18] "'[F]ederal courts cannot give answers simply because someone asks.'" *Moore v. Harper*, 600 U.S. 1, 55 (2023) (Thomas, J., dissenting) (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 304 (2021) (Roberts, C.J., dissenting)). Thus, despite the majority's view that it is "important to engage with [the parties' arguments,] even if the offending legal rule is now gone," *ante* at 11, what follows remains an advisory opinion, *see Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1337-38 (Fed. Cir. 2007) (explaining that, under the doctrine prohibiting advisory opinions, "federal courts are to decide only 'actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it'" (quoting *Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960))); *Norvell v. Peake*, 22 Vet.App. 194, 200 (2008).

[19] In fact, after the majority holds in Parts IV and V that *Bowling* was wrong to apply § 4.16(b) to the Board and should be overruled, we remain in the same place we would have been after concluding in Part III that *Bowling*'s mandatory referral requirement has been effectively overruled: The Board may address extraschedular TDIU in the first instance, but it is not precluded from seeking initial consideration by the Director—an outcome with which we agree.

[20] Notably, the majority does not cite to any language from *Bowling* to support its proposition that the Court "answered in the affirmative" that "the Board counts as a rating board." *Ante* at 12.

26

with that regulation, but the Court simply did not engage in *any* regulatory interpretation of the words "rating boards" and did not purport to define the term as including the Board of Veterans' Appeals. Indeed, the Court's only references to "rating boards" occur in its quotations of the regulation. *See Bowling*, 15 Vet.App. at 6, 9, 10.

Notably, however, *Bowling* did cite to the separate statement in *Floyd*, which in part explains that, although the extraschedular rating regulation at issue there—§ 3.321(b)(1)—was in part 3 of title 38 of the Code of Federal Regulations, "all the adjudication regulations in part 3 . . . generally apply to the [Board] in its adjudication of cases, *even where a particular regulation does not specifically refer to the Board*." 9 Vet.App. at 99 (Steinberg, J., concurring in part and dissenting in part) (emphasis added) (citing *Douglas v. Derwinski*, 2 Vet.App. 435, 441 (1992) (en banc)); *see Bowling*, 15 Vet.App. at 10. As for part 4 of title 38 of the Code of Federal Regulations, where the regulation at issue here is found, the Court at that time had already concluded that the Board must comply with regulations such as 38 C.F.R. §§ 4.1, 4.2, 4.14, 4.40, and 4.45, even though the Board was not explicitly mentioned therein. *See, e.g.*, *DeLuca v. Brown*, 8 Vet.App. 202, 206-08 (1995); *Fanning v. Brown*, 4 Vet.App. 225, 230-31 (1993); *Schafrath v. Derwinski*, 1 Vet.App. 589, 592-94 (1991). The Court had even held that the RO's determination whether to refer a case to the Director under § 4.16(b) "is an adjudicative decision" and remanded because "the § 4.16(b) issue was not adjudicated by the Board." *Fisher v. Principi*, 4 Vet.App. 57, 60 (1993), *reconsideration denied sub nom. Fisher v. Brown*, 4 Vet.App. 405 (1993) (per curiam order); *see Floyd*, 9 Vet.App. at 99 n.2 (Steinberg, J., concurring in part and dissenting in part) (citing *Fisher*, 4 Vet.App. at 407). So, rather than incorrectly *interpreting* the phrase "rating boards" as encompassing the Board of Veterans' Appeals, it seems equally, if not more, likely that the *Bowling* Court may have simply *assumed* that the Board must comply with the referral provision because it is part of an adjudicatory regulation.

Briefly turning to the other stare decisis factors, the majority concludes that *Bowling* has led to workability problems in the form of unnecessary delays in the resolution of appeals. *Ante* at 15. Yet, the majority does not acknowledge that any concerns in this regard would likely be quelled by the majority's first holding—that, in light of Supreme Court caselaw, the Board cannot be categorically precluded from addressing extraschedular TDIU in the first instance. With Board referral no longer obligatory as a result of that holding, it is unclear why the Court would assess this factor in terms of whether a *mandatory* referral requirement has proven unworkable. Finally,

27

an important consideration unaddressed by the majority is the Agency's ability to modify a regulation that it believes the Court has interpreted incorrectly. *See Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 456 (2015) (explaining that stare decisis "carries enhanced force" in cases of nonconstitutional interpretation). Here, despite having amended the regulation at issue during the more than 20 years since *Bowling* was decided,[21] the Agency has not made any substantive changes clarifying that the referral requirement is inapplicable to the Board. Thus, it is possible that this factor may weigh against the Court revisiting an old precedent.[22]

## IV. CONCLUSION

For these reasons, although we agree with the result in this case, we do not join the majority's discussion in Parts III and VI as to why *Bowling* has been effectively overturned, and we respectfully dissent from Parts IV and V of the majority's opinion reinterpreting § 4.16(b) and holding that the stare decisis factors weigh in favor of formally overruling *Bowling* to the extent that it found § 4.16(b) applicable to the Board.

---

[21] Indeed, VA updated the title of the official who may assign extraschedular TDIU but made no change pertinent to the Board. *See* 79 Fed. Reg. 2099, 2100 (Jan. 13, 2014).

[22] To the extent that the majority suggests that neither an appellant nor VA could have an interest in referral, *ante* at 15-16, the Court has previously held that referral "can provide a degree of uniformity over [extraschedular] decisions" and may provide awareness to the Director, permitting him "to assess whether changes to the rating schedule or § 4.16(a) might be warranted," *Wages v. McDonald*, 27 Vet.App. 233, 238 (2015), and fair process requires considering whether appellants would be prejudiced by the Board addressing an issue in the first instance, *see Bernard*, 4 Vet.App. at 394.

28